**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

Nancy Adams, *et al.*,

Plaintiffs,

v.

Case No. 2:03cv300

Lucent Technologies, Inc.,

Judge Michael H. Watson

Defendant.

**OPINION AND ORDER**

Before the Court are the following:

1. The June 30, 2006 Motion of Defendant Lucent Technologies, Inc. (hereinafter "Defendant" or "Lucent") for Summary Judgment (Docs. 119 and 120, hereinafter referred to as Doc. 120). Plaintiff Nancy Adams (hereinafter "Plaintiffs")[1] filed a Memorandum in Opposition on August 7, 2006 (Doc. 129). Defendant filed a Reply Memorandum on August 29, 2006 (Doc. 146).

2. The September 11, 2006 Motion of Plaintiffs for Leave to File Surreply (Doc. 148). Defendant filed a Memorandum in Opposition on September 14, 2006 (Doc. 150).

These matter are ripe for review. For the reasons stated herein, Defendant's Motion for Summary Judgment is **GRANTED** and Plaintiffs' Motion for Leave to File Surreply is **GRANTED**.

[1]Due to the numerous Plaintiffs in this action, the Court shall list only Ms. Adams at this point in the Opinion.

## I. PROCEDURAL HISTORY

The instant action was initially filed on April 7, 2003 (Doc. 1) by 372 former employee's of Defendant's Columbus Works alleging age discrimination in the termination of their employment in violation of the Age Discrimination in Employment Act (hereinafter "ADEA"), 26 U.S.C. §626(a), O.R.C. §4112.01 *et seq.*, the common law and Ohio public policy.

Plaintiffs filed a notice of voluntary dismissal for nine Plaintiffs on May 10, 2005 (Doc. 52), On May 11, 2006, the Court dismissed 77 Plaintiffs (Doc. 113). Additionally, nine Plaintiffs died since the events at issue, three of whom died prior to the filing of this action. Suggestions of death were filed May 15, 2006 (Doc. 114). Plaintiffs' counsel reported to the Court last year that five additional Plaintiffs were to be voluntarily dismissed (Doc. 51), however, a dismissal has not been filed to date by Plaintiffs' counsel.

## II. FACTS

### *A. Background*

Lucent, a telecommunications company, came into existence in 1996 as the result of AT&T splitting itself into three companies.[2] (Doc. 120) Lucent operated a manufacturing facility, Columbus Works, for electronic equipment in Columbus, Ohio. (Doc. 1) Plaintiffs were former employees of Lucent's Columbus Works facility who were engaged in the manufacture of electronic telephone equipment. (Doc. 120)

---

[2]AT&T employees who moved to Lucent carried with them some beneficial legacies, including their service or seniority. As such, when an employee states he has 30 years of service with Lucent, the employee is referring to the combined period of service from AT&T and Lucent.

Lucent was launched as the telecommunications ("telecom") industry boomed. (*Id.*) In this highly competitive environment, Lucent sought strategies to improve its competitiveness. (*Id.*) As such, Lucent examined reducing its fixed costs by outsourcing its manufacturing. (*Id.*) This would require selling Columbus Works and other manufacturing facilities and entry into agreements with contract manufacturers to supply the goods which Lucent developed. (*Id.*)

The International Brotherhood of Electrical Workers ("IBEW"), the union which represented Plaintiffs, actively opposed this strategy, (*Id.*) As such, the IBEW filed an unfair labor practice charge ("ULP") against Lucent in 1999. Lucent and the IBEW settled their dispute in early 2001. (*Id.*)

The settlement resulted in a Memorandum of Agreement (hereinafter "MOA") (Doc. 120, Exh. G). The MOA established the compensation terms which Lucent committed to pay to employees who lost their jobs as a result of outsourcing, which included selling manufacturing facilities. (*Id.*) Additionally, if Lucent instituted a reduction in force at any of the plants subject to sale prior to a sale, the MOA required Lucent:

(a)     pay the MOA benefits to any of the employees laid off or terminated; and

(b)     offer the MOA benefits as part of a voluntary package first, to permit higher seniority employees to obtain those benefits, if they so elected, in connection with their retirement decisions.

(*Id.*)  However, the MOA did not provide benefits to employees in the event of a merger or sale of Lucent. (*Id.*)

Prior to the consummation of the MOA, Lucent publicly announced Columbus Works was one of the manufacturing facilities which would be sold to a contract manufacturer. (Doc. 120) In January, 2001, Lucent believed a sale would be accomplished in six months and that no personnel changes need occur prior to the sale. (*Id.*)

The sale of Columbus Works did not proceed according to the anticipated time-table. An initial prospect fell through in June, 2001. (*Id.*) Another prospect tentatively signed in July, 2001, contingent upon negotiations with the union. The deal did not close until December 1, 2001. (*Id.*)

*2. The May 2001 Announcement of the Special Voluntary Offer*

While Lucent looked for a purchaser of the Columbus Works facility, the telecom industry continued its downturn. (*Id.*) Accordingly, the local management team in Columbus met and collectively decided the demand for their products no longer justified the current workforce and a reduction in force was necessary. (*Id.*)

Accordingly, on May 1, 2001, Lucent announced (hereinafter "May 1 Announcement") it would "reduce approximately 400 occupational positions at the Columbus Works location. This reduction...will be accomplished through a voluntary and, if necessary, an involuntary workforce reduction." (Doc. 120, Exh. A-1) As such, employees with sufficient service to retire were able to do so with significantly enhanced benefits. (Doc. 1) These benefits included:

- an enhanced transition leave of absence;
- an expanded and enhanced social security supplement;
- a special pension benefits equivalent to 110 percent of the termination allowance an employee would have been eligible for if the employee had been laid off;
- an enhanced pension benefit of $11,000;
- extended benefit coverage; and an enhanced education/retraining allowance.

(Doc. 120, Exh. A-1)

The May 1 Announcement notified eligible employees they would receive a Special Voluntary Offer (hereinafter "SVO") package on May 11, 2001. (*Id.*) A request to participate could be submitted between May 11, 2001 and May 29, 2001 at 3 p.m. EST. (*Id.*) Lucent reserved the right to accept or reject an SVO application (*Id.*) Moreover, an electing employee would be terminated on June 30, 2001, with the express provision she or he would not be offered employment with the contract manufacturer who would purchase Columbus Works. (Doc. 129)

More than 900 employees submitted SVO applications. Lucent permitted 566 employees to participate and retire.[3] (Doc. 120) Plaintiffs employment with Lucent was terminated on or about June 30, 2001. (Doc. 120, Exh. A-1)

3. *Lucent-Alcatel Talks*

During 2001, executives from Lucent and Alcatel, a French competitor of Lucent's, met to discuss the sale of a portion of Lucent's business to Alcatel. Those discussions progressed to talks about a merger between the two companies. (Doc. 120, Exh. D) Speculation about the occurrence of such talks surfaced briefly in The Wall Street Journal on Friday, April 27, 2001. (Doc. 120, Exh. I-1) No press reports discussing the proposed merger appeared again until articles in The New York Times and The Wall Street Journal on May 18, 2001. (Doc. 120, Exh. I-3) In the interim, the SVO was announced. (Doc. 120, Exh. A-1)

---

[3]While this number is greater than the 400 occupational positions that local management stated it expected to layoff in the event of an unsuccessful voluntary program, in fact, Lucent states the program was right on target. Most of the additional participants (132) came from the "clerical" job classifications – an area for which local management had not announced any layoff target. Within the "occupational" positions, Lucent created internal targets for various job classifications and stayed close to each. In the line manufacturing positions, Lucent targeted a reduction of 332 positions and approved 329 participants. (Att. E-2, E-3, E-4.) In the two Tester job categories, Lucent targeted a reduction of 53 positions and approved 61 participants. The vast bulk of the increased number of participants occurred in the group known as the "Trades," in which 44 were approved, 29 more than the original target of 15. Trades employees, though, did not produce goods. They included electricians and plumbers who performed certain maintenance tasks that could be easily performed by outside vendors. (Att. C-9, Free Dep. at 104.) Local management, moreover, exercised its decision to expand the numbers carefully. Mr. Hines explained his thinking:

> In any kind of down-sizing like this, I would always know the number of people who volunteered. If the number was greater than the number we said we wanted at the outset, I would encourage my staff to figure out a way to allow more people to volunteer. I always did it that way, because I knew that they would be inclined to be conservative on the number they would take because they were trying to protect their ability to do their jobs. So I would be the pressure to say, "Can we take more?" And that's the discussion we would have had. And it's not very mathematical; it's intuitive.

(Hines Dep. at 55.)

The New York Times article claimed that "executives close to the discussions . . . described the odds of the deal happening at 50-50." Simon Romero and Andrew Ross Sorkin, *Alcatel Said to be in Talks to Buy Lucent*, The New York Times, May 18, 2001 available at www.nytimes.com/2001/05/18/technology/18LUCE.html. (Doc. 120, Exh. I-3) The Wall Street Journal article stated "Any deal...would have to overcome internal obstacles...." Phyllis Plitch and Riva Richmond, *Alcatel-Lucent Not Anticompetitive, Though Unlikely*, The Wall Street Journal, May 18, 2001 available at www.stern.nyu.edu/networks/quotes/Dow_Jones_May_18_2-1.htm. (*Id.*) News articles continued to appear over the next ten days. (Doc. 120, Exh. I-5, I-6.)

During this time, Lucent and Alcatel believed they were on track to close a deal. (Doc. 120, Exh. D) However, over the Memorial Day weekend, an impasse arose over issues which were fundamental to Lucent. (*Id.*) On May 28, 2001, Henry Schacht, Lucent's CEO, addressed the Lucent Board of Directors and recommended terminating the negotiations. (*Id.*) The Board agreed and Mr. Schact provided this information to Serge Tchuruk, Alcatel's CEO, and allowed Alcatel overnight to consider any concessions it may make in order to restore the viability of a deal. (*Id.*) The morning of May 29, 2001, Messrs. Schacht and Tchuruk spoke, concluding they were still at an impasse. (*Id.*) A formal vote of the Lucent Board that day terminated the discussions. (*Id.*) Mr. Schacht informed Mr. Tchuruk of this decision late-morning, May 29, 2001. (*Id.*)

Due to the press attention the proposed merger garnered, Messrs. Schacht and Tchuruk agreed to issue a joint statement which was to be released May 29, 2001. (*Id.*) Mr. Schacht directed Lucent's media relations group to coordinate with its Alcatel

counterpart to draft a statement. (*Id.*) Lucent issued the press release in the United States between 4:00 and 4:30 p.m. EST on May 29, 2001. (Doc. 120, Exh. E-6.)

4. *IBEW Information Regarding Lucent-Alcatel Proposed Merger*

In addition to the media stories, the IBEW dispersed handbills to its members regarding the merger. A May 25, 2001 handbill, issued by IBEW Local 2020 President and Business Manager Paul Smith stated:

> Management has indicated to union officials that a merger, should it occur, is not expected to impact the sale of the Columbus Works. The company intends to complete the sale of Columbus and Okalahoma city [sic] locations as planned.
>
> The decision to accept the early offer of the 'effects package' should be based on each individual's situation.
>
> ***

(Doc. 120, Exh. F-1.) Mr. Smith issued another handbill the morning of May 29, 2002, which stated:

> This handbill is to clarify the one issued Friday [May 25, 2001]. Some of our members mistakenly thought they were being assured the Company is going to sell the Columbus Works, There is NO guarantee the Company will sell Columbus Works or merge with Alcatel! Some of those in Management have indicated that a merger, should it occur, is NOT expected to impact the sale of Columbus and Oklahoma City locations and the Company intends to complete the sale. That is NOT a promise or guarantee! Their position could change anytime!
>
> The decisions to accept the early offer of the "effects package" should be based on each individual's situation!
>
> ***

(Doc. 120, Exh. F-2.)

*5. Atmosphere at Columbus Works*

The atmosphere at Columbus Works was tense due to the media publications regarding the proposed merger between Lucent and Alcatel. (Doc. 129) The stress and concern the employees felt was even more heightened on May 29, 2001. (*Id.*) According to Daniel Leasure, a Lucent security guard:

> On May 29, 2001,...[p]eople were extremely upset. I stopped frequently to talk to people who were crying and not sure they were making the right decision. I remmber specifically stopping to talk to Carol Hanes and Mary Bleicharz who were crying, very distraught and extremely emotions. They and other employees felt they were being forced to accept the offer or stay and be laid off under circumstances where their pension benefit under the [MOA] would not be protected in the event of a merge with Alcatel which appeared to be close to a done deal.

(Doc. 129, Exh. 9G)

*4. Purchase of Columbus Works*

Subsequently, Celestica, Inc., a manufacturer based in Canada, bought the Columbus Works facility. On August 30, 2001, Lucent extended another offer to induce employees to retire or resign, in which 225 employees participated.

Celestica assumed ownership of the plant on December 1, 2001. While some Lucent employees became Celestica employees, others became involuntarily unemployed. The number of represented (union) employees working for Lucent at Columbus Works declined from 2,391 on May 1, 2001, to 1,669 on November 1, 2001, to 328 on December 1, 2001. (Att. B-3.) Less than a year after purchasing the Columbus Works, Celestica closed the facility and laid off its entire workforce. (Att. H-8; Att. C-10, Craviso Dep. at 36.)

*5. Discrimination Charges*

On December 28, 2001, Plaintiffs filed charges of discrimination against Lucent with the Ohio Civil Rights Commission (hereinafter "OCRC") and the Equal Employment Opportunity Commission. (Doc. 120) Plaintiffs alleged they were discriminated against on the basis of age. (*Id.*)

On or about October 31, 2002. OCRC concluded there was no probable cause to believe that Lucent engaged in an unlawful discriminatory practice and dismissed the case. (*Id.*) Furthermore, on or about January 6, 2003, the EEOC informed Plaintiffs that it was closing its file due to its adoption of OCRC's findings. (*Id.*)

On April 7, 2003, Plaintiffs filed the instant action for age discrimination in violation of 29 U.S.C. §623[4], O.R.C. §4112.01 *et seq.*, the common law and Ohio public policy. (Doc. 1)

## III. ANALYSIS

*A. Summary Judgment Standard*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *See Matsushita*

---

[4] 29 U.S.C. §626(a) is the statute Plaintiffs cite in their Complaint, which states " Attendance of witnesses; investigations, inspections, records, and homework regulations. The Secretary shall have the power to make investigations and require the keeping of records necessary or appropriate for the administration of this Act in accordance with the powers and procedures provided in sections 9 and 11 of the Fair Labor Standards Act of 1938...." As such, the Court concludes Plaintiffs meant to state 29 U.S.C. §263(a), which is set forth below.

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986). The moving party bears the initial burden of showing the absence of a genuine issue of material fact, but then the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Matsushita*, 475 U.S. at 587. However, the nonmoving party may not rest on the mere allegations in the pleadings. Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at

*B. Age Discrimination*

Plaintiffs allege Lucent discriminated against them on the basis of age as a result of the disparate impact the SVO had on individuals over the age of fifty. Plaintiffs argue the SVO was not a retirement plan, but was instead, a clever subterfuge to discharge unwanted employees under the guise of "electing" benefits which had been guaranteed in the MOA. Plaintiffs contend the SVO offered nothing which they did not already have except termination in reverse seniority. Plaintiffs assert that had Lucent simply announced layoffs, the junior employees would have been the first to go, as required by the IBEW contract. This, Plaintiffs contend, is exactly the opposite of what Lucent wanted as an aging, highly paid, workforce would be left to offer a contract manufacturer who was interested in building its own personnel base and cutting costs. Plaintiffs argue Lucent knew of its employees concerns about Alcatel and deliberately held off announcing the end of the merger talks with Alcatel until after the 3:00 p.m. EST deadline in order to force older employees to decide to accept early retirement.

The ADEA provides: "It shall be unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's age." 29 U.S.C.§ 623(a). Congress recognized that "older workers [often] find themselves disadvantaged in their efforts to retain employment," and thus passed the ADEA, in part, "to promote employment [*6] of older persons based on their ability rather than age," and "to prohibit arbitrary age discrimination in employment." 29 U.S.C. § 621. To prevail in an action under the ADEA, a plaintiff must show her age had a "determinative influence on the outcome" of the employment decision. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141 (2000), *quoting, Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993).

1. Disparate Impact

Plaintiffs may allege a disparate impact claim under the ADEA. *See Smith v. City of Jackson*, 544 U.S.228 (2005) (holding that disparate impact claims are available under the ADEA). A disparate impact claim does not require a showing of discriminatory motive. *Int. Bhd. of Teamsters*, 431 U.S. at 335 n.15 ("Proof of discriminatory motive... is not required under a disparate-impact theory."); *Pacheco*, 448 F.3d at 787 ("In disparate-impact cases, proof or finding of discriminatory motive is not required."). Instead, the entire "necessary premise of the disparate impact approach is that some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination." *Ortega v. Safeway Stores, Inc.*, 943 F.2d 1230, 1242 (10th Cir. 1991). In other words, a disparate impact claim involves "employment practices or policies that are facially neutral in their treatment of... protected groups, but, in fact, have a disproportionately adverse effect on such... protected group[s]." *Pacheco v. Mineta*, 448 F.3d 783, 787 (5th Cir. 2006).

While recognizing the ADEA authorizes recovery in disparate impact cases, the *Smith* Court clarified that the "scope of disparate impact liability under [the] ADEA is narrower than under Title VII." *Smith*, 544 U.S. at 240.[5] As such, the interpretation of disparate impact liability as articulated in *Wards Cove Packing Co. V. Atonio,* 490 U.S. 642 (1989) "remains applicable to the ADEA." Id..

a. *Prima Facie* Case

The framework established in *Wards Cove* requires that "to establish a prima facie case of disparate impact discrimination, [a] plaintiff[ ] must show that a specific identifiable employment practice or policy caused a significant disparate impact on a protected group." *Ortega*, 943 F.2d at 1242, *citing Wards Cove*, 490 U.S. at 655-56. "Thus, an employee must point to both a significant disparate impact and to a particular policy or practice that caused the disparity." *Pippen v. Burlington Resources Oil and Gas, Co.,* 440 F.3d 1186, 1200 (10th Cir. 2006).

---

[5]The *Smith* court opined,

> Two textual differences between the ADEA and Title VII make it clear that even though both statutes authorize recovery on a disparate-impact theory, the scope of disparate-impact liability under ADEA is narrower than under Title VII. The first is the RFOA [reasonable factor other than age] provision, which we have already identified. The second is the amendment to Title VII contained in the Civil Rights Act of 1991, 105 Stat 1071. One of the purposes of that amendment was to modify the Court's holding in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989), a case in which we narrowly construed the employer's exposure to liability on a disparate-impact theory. *See* Civil Rights Act of 1991, § 2, 105 Stat 1071. While the relevant 1991 amendments expanded the coverage of Title VII, they did not amend the ADEA or speak to the subject of age discrimination. Hence, *Wards Cove's* pre-1991 interpretation of Title VII's identical language remains applicable to the ADEA.

Furthermore, "it is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact. Rather, the employee is 'responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities.'" *Smith,* 544 U.S. at 241, *quoting Wards Cove*, 490 U.S. at 656. In other words, a plaintiff must present "relevant statistical analysis [to] prove[ ] that the challenged practice has an adverse impact on a protected group." *Johnson v. U.S. Dept. of Health and Human Servs.*, 30 F.3d 45, 48 (6th Cir. 1994), *citing Scales v. J.C. Bradford & Co.*, 925 F.2d 901, 907-08 (6th Cir. 1991).

b. Reasonable Factor Other Than Age ("RFOA")

Upon an employee establishing their *prima facie* case, "the burden of production shifts to the employer to assert that its neutral policy is based on a reasonable factor other an age." *Pippen*, 440 F.3d at 1200.[6] Thus, the employer is not liable for such actions "if the adverse impact was attributable to a nonage factor that was 'reasonable.'" *Smith*, 544 U.S. at 239, 125 S. Ct. at 1544. Therefore, as explained by the *Pippen* court

> to prevail on an ADEA disparate impact claim, an employee must ultimately persuade the factfinder that the employer's asserted basis for the neutral policy is unreasonable....The test is not whether there were other more narrowly

---

[6]This departs from the *Wards Cove* analysis, which, as previously stated, involved disparate impact under Title VII. The ADEA encompasses different statutory language than Title VII. Specifically, the ADEA states:

> It shall not be unlawful for an employer...to take any action otherwise prohibited....where age is bona fide occupational qualification reasonably necessary to the normal operation of the particular business, or where the differentiation is based on reasonable factors other than age.

29 U.S.C. § 623(f)(1). By contrast, in a Title VII case the employer must show that the practice is a "business necessity." 42 U.S.C. 2000e-2(k)(1)(A); *Pacheco*, 448 F.3d at 787.

> tailored ways for the employer to achieve its legitimate business goals...Instead, the employee must show that the method selected was unreasonable.

*Pippen* at 1201 (citations omitted).

2. Application to Plaintiffs Claims

First, it is not clear whether the neutral policy of Defendant's which Plaintiffs are challenging is Defendant's offering of the SVO with a seniority preference for enrollment or the decision to withhold the announcement of the termination of the merger talks with Alcatel unitl after 4:00 p.m. on May 29, 2001. As such, the Court will examine both policies.

The facts in this matter reveals Plaintiffs fail to establish a *prima facie* case of disparate impact. They do not set forth a proper disparate impact claim and analysis. Instead, as argued by Defendant, Plaintiffs mesh disparate treatment with disparate impact. However, these are distinct legal theories with differing tests. As stated above, in a disparate impact claim the employer's policy is *neutral*. However, Plaintiffs currently argue that the SVO was a subterfuge for age discrimination, which is contradictory to the policy being neutral as required by disparate impact claim..

There is no basis in fact for Plaintiffs' allegation that Defendant intentionally withheld the information that the Lucent-Alcatel merger talks were unsuccessful in order to have the older employees accept early retirement. The sole piece of "evidence" upon which Plaintiffs rely is a CNN article which states that the Lucent-Alcatel merger was off, which Plaintiffs contend was posted on the internet at 9:52 GMT, approximately 4:00 a.m. EST, on May 29, 2001, the morning of the deadline for submitting the SVO application. (Doc. 129, Exh. 11C) First, the Court is unable to conclude the article was

posted at 4:00 a.m. EST as it discusses the press release by Lucent and Alcatel which was released after 4:00 *p.m.* EST on May 29, 2001. As Plaintiffs do not dispute the fact that this was when the press release was issued, it is impossible for the CNN article to have been published approximately 12 hours *before* the press release was published. Second, if this article was published at 4:00 a.m. EST on May 29, 2001, then the information was available to Plaintiffs prior to the 3:00 p.m. EST filing deadline. As Plaintiffs rely heavily on other news articles of the possible merger as support for why they originally submitted their SVO applications, there are unable to pled ignorance of the availability of this information and rest the blame at the feet of Defendant for not informing them.

Furthermore, notwithstanding the timing of the CNN article, Plaintiffs offer nothing to support their assertion that either the failure to inform Plaintiffs of the unsuccessful conclusion of the merger talks prior to the 3:00 p.m. EST deadline or the offering of the SVO resulted in a significant disparate on a protected group, *i.e.* Lucent employees 40 years of age and older. Instead, they simply point to to the number of older workers who accepted the SVO as support for a claim of disparate impact. This is legally insufficient. Moreover, Plaintiffs fail to offer *any* statistical analysis to demonstrate that either the failure to inform Plaintiffs of the unsuccessful conclusion of the merger talks prior to the 3:00 p.m. deadline or the offering of the SVO had an adverse impact on employees 40 years of age and older. *See Johnson*, 30 F.3d 45, 48. Accordingly, the record before the Court is devoid of any evidence upon which a *prima facie* case of disparate impact can be established.

However, even if Plaintiffs establishe a *prima facie* case, Defendant presents evidence that either neutral policy, the 4:00 p.m. announcement or the offering of the SVO, were based on a reasonable factor other than age (hereinafter "RFOA"). As to the timing of the announcement, Defendant contends it made a judgment decision to announce the end of the merger talks after the close of the stock market since it could have affected its stock price, By announcing after the close of the market, the information regarding the unsuccessful merger would be digested and evaluated in the hours before trading would resume. As such, Defendant sets forth a business judgment for the timing of its announcement which is based upon a RFOA. *See, e.g. Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1274 (After the stock market closed, MCI announced major restructuring). Moreover, reliance upon seniority to offer the SVO and the MOA benefits, which would not have been available to employees who left voluntarily, is also a decision based upon a RFOA. *See Smith v. City of Jackson*, 544 U.S. 228, 242 ("Reliance on seniority and rank is unquestionably reasonable given the City's goal of raising employees' salaries to match those in surrounding communities.")

Finally, Plaintiffs fail to present any evidence or argument which demonstrates the unreasonableness of either of Defendant's decisions. As the Plaintiff "must ultimately persuade the factfinder that the employer's asserted basis for the neutral policy is unreasonable", *Pippen*, 440 F.3d at 1200, and they have failed to do so, the Court concludes judgment as a matter of law in favor of Defendant is appropriate.

## IV.    CONCLUSION

An examination of the evidence presented by the parties results in the conclusion summary judgment is appropriate. Plaintiffs present a long and detailed rendition of what transpired at Lucent during the relevant time-frame. They convey the uncertainty and concern for the future which was rampant at Columbus Works while the merger talks were ongoing and the SVO offer was available. The Court is empathetic to the turmoil Plaintiffs experienced in not knowing what their employment future held and what decisions to make which would be best for them. Nevertheless, Plaintiffs present no evidence to the Court which demonstrates a genuine issue of material fact of age discrimination based upon a disparate impact resulting from Defendant's neutral policies of either announcing the end of the merger talks after the stock market closed and after the passing of SVO acceptance deadline or relying upon seniority for the SVO. There is no evidence which demonstrates a *prima facie* case of disparate impact. Furthermore, even if Plaintiffs did establish a *prima facie* case, the record is devoid of any evidence that Defendant's business decisions were not reasonable.

Accordingly, drawing all reasonable inference in favor of Plaintiffs, the Court concludes no genuine issue of material fact exists. Thus, judgment as a matter of law is appropriate and the June 30, 2006 Motion of Defendant for Summary Judgment (Doc. 120) is hereby **GRANTED**. This matter is hereby **DISMISSED** and **ORDERED** removed from the docket of this Court.

**IT IS SO ORDERED.**

Michael H. Watson, Judge
United States District Court